**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ted Stevenson ANGWIN and Christine Khamis, Defendants–Appellants.**

**Nos. 00–50276, 00–50411**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 2001

Filed Aug. 30, 2001

Joel Levine, Joel Levine, A Professional Corporation, Encino, California, for defendant-appellant Ted Stevenson Angwin.

Jerry M. Leahy, Law Offices of Jerry M. Leahy, San Diego, California, for defendant-appellant Christine Khamis.

Patrick K. O'Toole, United States Attorney, Bruce R. Castetter, Assistant United States Attorney, Chief, Appellate Section, Criminal Division, Mark R. Rehe, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Before: FERGUSON and SILVERMAN, Circuit Judges, and BREYER,* District Judge.

Opinion by District Judge BREYER; Partial Concurrence and Partial Dissent by Judge FERGUSON.

## OPINION

BREYER, District Judge:

The appellants Ted Stevenson Angwin and Christine Khamis ("the defendants") were stopped by United States Border Patrol ("USBP") agents at a checkpoint near Niland, California. The agents inspected the motorhome the defendants were driving and found fourteen illegal aliens hiding throughout the vehicle. The defendants were indicted and, after a joint jury trial, convicted. This is an appeal from the district court's orders: (1) declining to sever the trial; (2) excluding Angwin's proposed habit evidence; (3) denying Angwin's motion to dismiss the indictment on the grounds that a conviction for bringing in illegal aliens cannot be premised on aiding and abetting; (4) denying the defendants' motions for acquittal for insufficient evidence; and (5) upwardly adjusting Angwin's sentence for creating a substantial risk of death or serious bodily injury. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

\* The Honorable Charles R. Breyer, United States District Judge for the Northern District

## I. BACKGROUND

### A. Factual Background

On October 24, 1999, Angwin, Khamis, and their dog were traveling north on Highway 111 in a motorhome. USBP agents stopped them at the checkpoint near Niland, California, approximately forty miles north of the United States–Mexico border. Angwin was driving, and Khamis was the only visible passenger.

When the defendants arrived at the checkpoint, USBP Agent Michael Mikuski asked if they were citizens of the United States. Angwin replied that they were. Mikuski asked Khamis if she was an American citizen, to which she replied in the affirmative without looking at Mikuski. Mikuski then asked if they were the only occupants of the vehicle. Angwin responded that it was just the two of them and the dog. While speaking to Angwin, Mikuski "noticed that his hands had a slight tremble, which indicated nervousness, and he ... kept breaking eye contact with me." Mikuski also noticed that Khamis "never looked my way, even when I was talkin' to her."

Mikuski then asked the defendants if he could inspect the motorhome, and Angwin consented. Mikuski directed Angwin to the secondary inspection area, where USBP Agent James Beresovoy asked Angwin and Khamis to exit the vehicle. The defendants waited near a checkpoint building while Beresovoy searched the vehicle. Upon entering the motorhome, Beresovoy discovered two Mexican citizens hiding under a table covered by a cloth. Agents Beresovoy and Mikuski eventually found a total of fourteen individuals hiding throughout the motorhome, including in the shower, in the bathroom, in a closet,

of California, sitting by designation.

and even lying in a small compartment under the bed. The agents learned that all fourteen of the individuals were Mexican citizens who were in the United States illegally.

Mikuski thereupon asked Angwin if there was anything he wanted to tell the agents about the inside of the motorhome. Angwin hesitated and stuttered, and then said that he had seen a van parked on the side of the road and that he had stopped to offer assistance. Angwin told Mikuski that when he stopped, several people climbed into the back of the motorhome. Angwin also indicated that he intended to take the people to the checkpoint and turn them over to the USBP.

At trial, Angwin testified that he acted under duress. Angwin asserted that he had pulled over so that the dog could walk around and relieve itself. Angwin stated that while Khamis walked the dog, he walked around the motorhome to inspect the tires. According to Angwin, two Latino men who were standing by a parked van on a nearby dirt road approached him and spoke to him in Spanish. One of the men turned toward the van and yelled, and the group of fourteen aliens, who had been hiding in the underbrush, ran toward the motorhome. Angwin testified that he tried unsuccessfully to stop the aliens from entering the vehicle. He claimed that one of the men who had approached him pushed him in a threatening manner and had a knife sheath on his belt. Angwin claimed that he believed that the wisest course of action was to drive to the upcoming USBP checkpoint. When the prosecutor asked Angwin why he did not reveal his version of the events to the USBP agents before they inspected the motorhome, Angwin stated, "I tried to answer, but I was a nervous wreck at that point and my mouth was dry and I'll never forget this; my tongue stuck to the top of my mouth and even the sides of it were sticking. And I couldn't get any words out."

While Khamis did not testify at trial, she did give a statement on October 24 to USBP Agent John Searle. According to Searle, Khamis indicated that the defendants had pulled off to the side of the road to let the dog walk around. After walking the dog briefly, Khamis allegedly told Searle that she saw Angwin off to one side of the motorhome speaking with an unidentified man. Angwin then asked her to get back into the motorhome, to sit in the passenger seat, and not to say anything. Khamis told Searle that she got back into the motorhome and heard and felt others entering the home as well. Khamis refused to sign a summation of her statement that Searle had prepared based on his notes from the interview, however.

Two aliens who were found in the motorhome, Hilario and Juan Vincente–Morales, were detained as material witnesses. Hilario Vincente–Morales testified at trial that he and his brother Juan had traveled from Mexico City to Tijuana to be smuggled to Los Angeles, where he understood that he would work to pay for his travel.[1] He indicated that a guide led them to the area by the side of the road where they hid to await the motorhome. Vincente–Morales stated that approximately fifteen minutes after they arrived, the motorhome pulled up and he saw a person who was not a member of their group wave towards the group as if to signal them. While he could not tell whether the person waving was a man or a woman, he said that the person was located toward the front of the vehicle on the passenger side.

---

1. Vincente–Morales also indicated that he gave a smuggler the phone number of a family member who he hoped would help him pay for his travel to Los Angeles.

## B. Procedural History

On November 3, 1999, a federal grand jury returned a four-count indictment against the defendants. Counts One and Three charged both defendants with aiding and abetting the bringing in of illegal aliens for financial gain in violation of 8 U.S.C. section 1324(a)(2)(B)(ii) and 18 U.S.C. section 2. Counts Two and Four charged both defendants with transportation of illegal aliens in violation of 8 U.S.C. section 1324(a)(1)(A)(ii).

Before trial, the defendants each moved to sever the trial on the grounds that the defendants had antagonistic defenses and that the admission of Khamis's statement to USBP agents would violate Angwin's Sixth Amendment Confrontation Clause rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), if Khamis did not testify. The district court denied the motions. Angwin also moved before trial to dismiss Counts One and Three of the indictment, charging him for bringing in illegal aliens under 8 U.S.C. section 1324(a)(2)(B)(ii) and 18 U.S.C. section 2, on the basis that liability for bringing in illegal aliens cannot be premised on aiding and abetting. The district court took the motion under submission pending the verdict.

On February 8, 2000, the district court commenced a jury trial. At trial, Angwin attempted to introduce evidence to show that his reactions both when the aliens entered the motorhome and at the checkpoint were consistent with his training and experience with rescuing distressed ships while serving in the Coast Guard Auxiliary. The United States objected that the evidence was not relevant, and the district court sustained the Government's objection, finding that the evidence lacked probative value since Angwin's rescue of people on the high seas was not parallel to the situation at issue in the trial.

On February 14, 2000, the jury found Angwin guilty on all four Counts but found Khamis guilty only on Counts Two and Four. Angwin renewed his motion to dismiss Counts One and Three and also filed a motion to set aside the verdict as to Counts One and Three for insufficient evidence. The court denied Angwin's motions. Khamis filed a motion for acquittal and a motion for a mistrial on the grounds of insufficient evidence, but the court denied those motions as well.

On May 15, 2000, the district court sentenced Angwin to thirty-six months imprisonment. The district court found that the motorhome was dangerously overcrowded and that the aliens were not properly restrained by seatbelts and on that basis concluded that Angwin had created a substantial risk of seriously bodily injury to the aliens. As a result, the court found that Angwin's base offense level as to Counts Two and Four was properly increased from 15 to 18 under United States Sentencing Guidelines ("USSG" or "Guidelines") section 2L1.1(b)(5).

## II. DISCUSSION

### A. The Motions to Sever

 Angwin argues on appeal that the district court erred in refusing to sever the defendants' trial both because the defendants presented antagonistic defenses and because Khamis's statement violated Angwin's Sixth Amendment Confrontation Clause rights under *Bruton.* A district court's refusal to sever a trial is reviewed for an abuse of discretion. *See United States v. Sarkisian,* 197 F.3d 966, 978 (9th Cir.1999), *cert. denied sub nom. Mikayelyan v. United States,* 530 U.S. 1220, 120 S.Ct. 2230, 147 L.Ed.2d 260 (2000). A claim that the admission of a non-testifying codefendant's out-of-court statement violated *Bruton* is reviewed de novo. *See United States v. Peterson,* 140 F.3d 819,

821 (9th Cir.1998). Confrontation Clause violations are subject to the harmless error test. *See United States v. Ortega,* 203 F.3d 675, 682 (9th Cir.2000).

### 1. Antagonistic Defenses

■ According to Angwin, the defendants presented antagonistic defenses that warranted severing the trial. The United States counters that Khamis's defense that she was duped did not preclude the jury accepting Angwin's duress defense.

■ To warrant severance on the basis of antagonistic defenses, codefendants must show that their defenses are irreconcilable and mutually exclusive. *See United States v. Sherlock,* 962 F.2d 1349, 1363 (9th Cir.1992). Defenses are mutually exclusive when "acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Tootick,* 952 F.2d 1078, 1081 (9th Cir.1991); *see United States v. Throckmorton,* 87 F.3d 1069, 1072 (9th Cir.1996) (noting that "a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant"). Even when defendants present antagonistic defenses, such defenses "are not prejudicial *per se.*" *Zafiro v. United States,* 506 U.S. 534, 538, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *see id.* at 539, 113 S.Ct. 933 (noting that "a district court should grant a severance under [Federal] Rule [of Criminal Procedure] 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence").

Here, there is little question that Angwin and Khamis did not present defenses that were mutually exclusive such that their defenses can be considered antagonistic. First, their theories were barely inconsistent, let alone antagonistic. Khamis claimed that there was insufficient evidence to show that she knew about the illegal activity, while Angwin argued that he acted under duress and therefore lacked the requisite criminal intent. Those defenses are not irreconcilable, as a jury could have believed that Angwin acted as he did out of fear and that Khamis was either unaware of the illegal activity or thought that she had been duped by Angwin. Indeed, courts have regularly rejected the argument that a defense based on ignorance is irreconcilable with a defense based on a lack of guilty intent such as duress. *See United States v. Harris,* 9 F.3d 493, 501 (6th Cir.1993); *United States v. Rocha,* 916 F.2d 219, 231 (5th Cir.1990); *United States v. Farrell,* 877 F.2d 870, 877 (11th Cir.1989).

Second, Angwin's testimony at trial and Khamis's statement to the USBP were not incompatible. Angwin's instructions to Khamis to get in the motorhome and not to say anything could be interpreted as the domineering commands of a person engaged in a criminal enterprise, but they could also be viewed as the nervous advice of a person who had been threatened. In addition, since Khamis told the USBP that she did not see the Latino men threaten Angwin, she would not have known that Angwin was intimidated. As a result, she might have been unaware of the illegal activity or felt duped by Angwin, not knowing that he was (in his version of the events) only driving to the checkpoint to turn the aliens over to the USBP.

■ Third, Khamis did little to implicate Angwin. Khamis did not testify, and her counsel did not cross-examine Angwin or present any evidence inculpating him. The only statement Khamis's counsel made that was adverse to Angwin was his assertion in closing argument that Angwin duped Khamis. An adverse statement

during a closing argument standing alone is insufficient to constitute an antagonistic defense. *See United States v. Ramirez*, 45 F.3d 1096, 1100 (7th Cir.1995). Moreover, Khamis's attorney specifically reminded the jury that they could find both defendants innocent. Under those circumstances, Khamis's counsel did not act as a "second prosecutor" such that the district court should have severed the trial.

Finally, the court issued limiting instructions and separate verdict forms for each defendant to minimize any prejudice. *See Zafiro*, 506 U.S. at 539, 113 S.Ct. 933.

As a result, the defendants did not present mutually exclusive defenses such that a jury could only believe one of the defendants. The defenses presented by Angwin (duress) and Khamis (lack of knowledge) were in this factual context only minimally inconsistent, let alone antagonistic. The district court therefore did not abuse its discretion in declining to sever the defendants' trial.

## 2. Angwin's *Bruton* Claim

▮ Angwin also contends that the admission of Khamis's statement violated his Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), since Khamis did not testify and was not subject to cross-examination.

▮ Under *Bruton* and its progeny, the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, clearly, or powerfully implicates the defendant. *See Bruton*, 391 U.S. at 135–36, 88 S.Ct. 1620; *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (limiting *Bruton* to statements that are incriminating on their face or expressly incriminating since statements that only become incriminating when linked with other evidence are inherently less prejudicial); *United States v.*

*Hoac*, 990 F.2d 1099, 1105 (9th Cir.1993) (noting that "a codefendant's statement that does not incriminate the defendant unless linked with other evidence introduced at trial does not violate the defendant's Sixth Amendment rights"). A statement is not facially incriminating merely because it identifies a defendant; the statement must also have a "sufficiently 'devastating' or 'powerful' inculpatory impact to be incriminatory on its face." *United States v. Olano*, 62 F.3d 1180, 1195 (9th Cir.1995) (quoting *United States v. Wright*, 742 F.2d 1215, 1223 (9th Cir.1984), *overruling on other grounds recognized by United States v. Valles–Valencia*, 823 F.2d 381 (9th Cir.1987)).

Angwin argues that Khamis's statement was incriminating in several ways. First, Khamis told USBP Agent Searle that she observed Angwin talking to another man while they were stopped by the side of the road and that Angwin told her to get back into the motorhome and to remain silent. Second, Khamis's statement failed to corroborate Angwin's testimony regarding the details of the real estate venture he was purportedly evaluating, thereby impeaching his testimony and negating the only legitimate explanation for his presence in the remote area. Third, Khamis's counsel used Khamis's statement to argue in his closing that Angwin duped Khamis into participating in the crime. According to Angwin, that the jury found Angwin guilty on all four counts while only finding Khamis guilty on two counts is powerful proof of the incriminating nature of Khamis's statement.

Angwin's second and third arguments fail as a matter of law. Khamis's failure to corroborate Angwin's testimony regarding his business activities is not facially incriminating; it is by definition only incriminating when linked with other evidence introduced at trial (namely, Angwin's testimony). That Khamis's counsel used

Khamis's statement in his closing to argue that she was duped is also insufficient to make the statement facially incriminating. Her counsel's argument was not evidence introduced against Angwin. Moreover, Khamis's statement did not contain any facts that would suggest that she was duped, and her counsel's argument regarding her statement does not transform the statement itself into incriminating evidence.

Angwin's first argument is also unpersuasive. While Khamis did tell Searle that she saw Angwin talking to a man by the motorhome, that Angwin told her to get into the motorhome, and that Angwin told her not to say anything, none of that evidence is powerfully or clearly incriminating. Khamis's statement could support a view that Angwin planned the rendezvous, brought her along for cover, and ordered her to remain silent as part of his role in the criminal enterprise, but her statement could also simply reflect Angwin's anxiety as a person who had been threatened and who was worried about Khamis's safety. *See* Section II.A.1 *supra* (noting that Angwin's testimony was not irreconcilable with Khamis's statement). At most, Khamis's statement was only mildly incriminating, particularly since it was consistent with Angwin's own testimony at trial. As a result, Khamis's statement does not approach the expressly inculpatory confession at issue in *Bruton*.

■■■ Even if the district court erroneously admitted Khamis's statement under *Bruton*, that error was harmless. To establish that the district court's er-

ror was harmless, the United States must show that the error was harmless beyond a reasonable doubt. *See United States v. Davis*, 932 F.2d 752, 761 (9th Cir.1991) (noting that an appellate court should not reverse a conviction if "substantial, independent and credible evidence of the defendant's guilt overwhelms whatever incriminating aspects inadmissible statements may have had in isolation").

■■■ Here, there was substantial evidence establishing Angwin's guilt. He rented and drove a vehicle with fourteen illegal aliens hidden in various compartments. He exhibited signs of nervousness such as an inability or unwillingness to maintain eye contact and a trembling in his hands. When asked by USBP Agent Mikuski whether he and Khamis were the only occupants of the vehicle, he lied, and when confronted about his story after the USBP's search revealed the aliens, Angwin stammered and stuttered and changed his story, suggesting that he was lying again.[2] The material witness Vincente–Morales also testified that the motorhome stopped right where his group had been waiting only about fifteen minutes after they arrived. Even without Khamis's statement, the United States had sufficient evidence to persuade a jury beyond a reasonable doubt that Angwin was guilty.

Moreover, the district court issued an appropriate limiting instruction that Khamis's statement was not to be used against Angwin right before Searle testified regarding Khamis's statement. *See Davis*, 932 F.2d at 761 (noting that such

---

2. Guilty intent can be inferred from the defendant's conduct and other circumstantial evidence, such as the defendant driving a vehicle full of contraband, lying or giving inconsistent statements to government agents, and exhibiting telltale signs of nervousness. *See United States v. Hernandez–Franco*, 189 F.3d 1151, 1155 (9th Cir.1999) (holding that guilty intent can be inferred from the defendant's conduct

and other circumstantial evidence), *cert. denied*, 530 U.S. 1206, 120 S.Ct. 2203, 147 L.Ed.2d 237 (2000); *United States v. Barbosa*, 906 F.2d 1366, 1368 (9th Cir.1990) (signs of nervousness); *United States v. Savinovich*, 845 F.2d 834, 838 (9th Cir.1988) (vehicle with contraband); *United States v. Haro–Portillo*, 531 F.2d 962, 963 (9th Cir.1976) (lying).

instructions are normally sufficient to prevent prejudice to a codefendant).

Thus, because Khamis's statement was not facially or powerfully incriminating, the district court did not violate Angwin's Confrontation Clause rights by admitting the statement and refusing to sever the trial. Even if the district court committed error, the United States has established beyond a reasonable doubt that the error was harmless.

**B. The Exclusion of Angwin's Proposed Habit Evidence**

Angwin next asserts that the district court erred by excluding testimony regarding his training and experience in the Coast Guard Auxiliary as habit evidence under Federal Rule of Evidence 406. According to Angwin, that evidence would have shown that his reactions when the aliens entered the motorhome and at the USBP checkpoint were consistent with his training and experience in the Auxiliary, which, he claims, had taught Angwin to take the least confrontational course of action in potentially dangerous situations. Angwin interprets the district court's remarks in excluding the evidence as doing so because the defendant intended to introduce multiple examples of his training as opposed to one example. In Angwin's view, that was a misapplication of Rule 406.

A district court's evidentiary rulings during trial are typically reviewed for an abuse of discretion. *See Old Chief v. United States,* 519 U.S. 172, 174 n. 1, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Fleming,* 215 F.3d 930, 938 (9th Cir.2000). We will only reverse if an erroneous evidentiary ruling more likely than not affected the verdict. *See United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir.), *cert. denied,* 530 U.S. 1268, 120 S.Ct. 2733, 147 L.Ed.2d 995 (2000). However, evidentiary rulings which raise predominantly legal questions regarding the interpretation of the Federal Rules of Evidence are reviewed de novo. *See United States v. Mateo–Mendez,* 215 F.3d 1039, 1042 (9th Cir.), *cert. denied,* 531 U.S. 983, 121 S.Ct. 437, 148 L.Ed.2d 444 (2000).

A district court's ruling on whether proffered evidence qualifies as habit evidence under Federal Rule of Evidence 406 is highly fact-specific. *See Mathes v. The Clipper Fleet,* 774 F.2d 980, 984 (9th Cir.1985) (noting that examples of conduct submitted for the purpose of establishing habit must be "carefully scrutinized" to ensure that they are numerous enough to justify an inference of systematic conduct). Because factual matters predominate in determining whether certain evidence sought to be introduced at trial qualifies as habit under Rule 406, we will employ an abuse of discretion standard.

Rule 406 provides: "Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person ... on a particular occasion was in conformity with the habit ..." Fed.R.Evid. 406. Habit "describes one's regular response to a repeated specific situation." Fed.R.Evid. 406 advisory committee note (describing conduct that qualifies as habit as "semi-automatic"). In deciding whether certain conduct constitutes habit, courts consider three factors: (1) the degree to which the conduct is reflexive or semi-automatic as opposed to volitional; (2) the specificity or particularity of the conduct; and (3) the regularity or numerosity of the examples of the conduct.[3] *See Weil v.*

---

**3.** These elements are not meant to be three discrete components, each of which must be

fully satisfied for evidence to qualify under Rule 406. Instead, a district court must con-

*Seltzer,* 873 F.2d 1453, 1460 (D.C.Cir.1989); *Simplex, Inc. v. Diversified Energy Sys., Inc.,* 847 F.2d 1290, 1293–94 (7th Cir.1988). The burden of establishing that certain conduct qualifies as evidence of habit falls on the party wishing to introduce the evidence. *See Weil,* 873 F.2d at 1461. Rule 406 is an exception to the general exclusion of character evidence under the Federal Rules, so courts are somewhat cautious in admitting the evidence.

 Angwin asserts that the district court excluded Angwin's proffered evidence regarding his training with the Auxiliary on the ground that Angwin wanted to present multiple examples of his conduct. In Angwin's view, the district court's rationale for excluding the evidence is diametrically opposed to the basis on which habit evidence is probative, which is that the conduct is done so repeatedly that it is reflexive or instinctual and therefore suggestive that the person acted in conformity with the habit during the event in question. Angwin is correct as a matter of applying the rule; the more frequently that someone has engaged in certain conduct, the more likely it is that the conduct will qualify as evidence of habit. However, Angwin has misinterpreted the district court's ruling and has failed to establish that his conduct constituted evidence of habit.

First, the district court did not reject Angwin's proffered evidence on the ground that Angwin wanted to show too many examples of his conduct and training. Instead, the court found that his training simply was not sufficiently parallel to his conduct on the day of the crime. The district court's comment that Angwin's Auxiliary training was not parallel implies that the court was skeptical about the probative value of the evidence, not that the court misinterpreted Rule 406. In other words, as the United States explains, the district court was not objecting to the quantity of Angwin's evidence but its quality. Because Angwin's experience in rescuing distressed boats at sea is not particularly similar to the factual context of his crime, *see infra,* the district court did not abuse its discretion in finding that Angwin's proffered evidence of habit was not relevant.[4]

 Second, even if the district court did employ a flawed understanding of the rule, the record is inadequate for Angwin to meet his burden of showing that his training and experience in the Auxiliary qualified as evidence of habit. Angwin's proffered evidence of his training was not sufficiently reflexive and specific to constitute habit evidence. His response to dangerous situations—prudently taking the least confrontational course of action—is hardly reflexive or semi-automatic. The defendant testified that he considered a variety of factors in deciding what to do once the aliens approached the motorhome, including the ages and physical condition of the Latino men who threatened him, the proximity of nearby towns as opposed to the USBP checkpoint, and other criteria. *See* Appellee's Br. at 33 n. 14. By its very nature, such calculation is volitional, a "deliberate assessment[ ] of a

sider the overall reliability of the evidence, using these factors as guides.

4. To the extent the district court based its exclusion of Angwin's proffered evidence on an understanding of Rule 406 by which a party must limit the examples of conduct constituting habit rather than show that the conduct was repeated over numerous instances,

the district court's ruling was in error. However, it is not clear that the district court employed such an understanding of Rule 406. Moreover, the Ninth Circuit may consider the rest of the record to see if there were alternative grounds on which the district court's ruling was proper. *See United States v. Alexander,* 48 F.3d 1477, 1487 (9th Cir.1995).

crisis before choosing a safe route of escape." *Id.* at 32–33. While specialized training might in some instances become habit, acting with particular care is distinguished from habit in the advisory notes to Rule 406. *See* Fed.R.Evid. 406 advisory committee note (distinguishing "character for care" and a "person's tendency to act prudently" from a "regular practice of meeting a particular kind of situation with a specific type of conduct").

In addition, Angwin's proffered conduct lacks the specificity required of habit evidence. Merely indicating that he takes a non-confrontational course of action in dangerous situations in general does not describe his conduct with sufficient particularity to be probative of whether he acted in conformity with that general practice on this particular occasion. Thus, the district court did not abuse its discretion in excluding Angwin's proffered conduct evidence, as his training and experience in the Auxiliary did not qualify as evidence of habit under Rule 406.

 Even if the district court should have admitted the evidence, its failure to do so was still harmless error. Since an error in interpreting the rules of evidence is not of constitutional magnitude, the United States must show only that the prejudice resulting from the error was more probably than not harmless. *See United States v. Mett,* 178 F.3d 1058, 1066 (9th Cir.1999). Angwin makes little effort to argue that he suffered prejudice from the district court's ruling, and given the substantial evidence of guilt, *see* Section II.A.2 *supra,* the United States has shown that the error more probably than not did not affect the verdict.

## C. Angwin's Motion to Dismiss Counts One and Three

 Angwin also asserts that a defendant may not be found guilty pursuant to 18 U.S.C. section 2 ("Title 18") on a theory of aiding and abetting a violation of 8 U.S.C. section 1324(a)(2).[5] In Angwin's view, subsection (a)(2) does not subject defendants to aiding and abetting liability, while subsection (a)(1) does expressly impose such liability. A district court's decision regarding whether to dismiss an indictment based on its interpretation of a federal statute is reviewed de novo. *See United States v. Hagberg,* 207 F.3d 569, 571 (9th Cir.2000).

Subsection (a)(1)(A) provides that a person who, knowing or in reckless disregard of the fact that a person is an alien, brings into the United States, transports within the United States, conceals, harbors, or shields from detection, encourages or induces such an alien to enter, or engages in a conspiracy to commit or aids and abets the commission of any of those acts shall be punished according to subsection (a)(1)(B). Subsection (a)(1)(B)(i) provides a maximum term of ten years for: (1) bringing in an alien regardless of whether it is done for commercial purposes; (2) conspiring to commit any of the subsection (a)(1)(A) offenses regardless of whether the conspiracy is performed for commercial purposes; or (3) transporting, harboring, or inducing entry for the purpose of commercial advantage or private financial gain. For non-commercial acts of transporting, harboring, or inducing entry, or for the aiding and abetting of any of the offenses (whether commercial or not), a defendant is subject to a maximum term of five years pursuant to subsection (a)(1)(B)(ii).

---

5. For ease of reference, this opinion will refer to the various provisions in 8 U.S.C. section 1324 by the relevant subsections.

Subsection (a)(2) provides that any person who "knowing or in reckless disregard of the fact that an alien has not received prior official authorization" to enter the United States "brings to or attempts to bring to the United States" such alien shall "(B) in the case of—(ii) an offense done for the purpose of commercial advantage or private financial gain" be fined and subject to imprisonment. A first or second violation results in a mandatory minimum sentence of three years and a maximum sentence of ten years, while a third or subsequent violation produces a sentence of not less than five nor more than fifteen years. *See* § 1324(a)(2)(B). Subsection (a)(2) does not expressly impose liability for aiding and abetting a violation of its terms.

According to the defendant, the fact that subsection (a)(1) specifically imposes liability for aiding and abetting while subsection (a)(2) does not means that Congress did not intend to impose liability for aiding and abetting under subsection (a)(2) through the general terms of Title 18. Angwin asserts that applying Title 18 to impose aiding and abetting liability under subsection (a)(2) would lead to an inconsistent reading of subsections (a)(1) and (2), permit Title 18 to trump section 1324, and render the aiding and abetting language in subsection (a)(1) surplusage.

On its surface, Angwin's interpretation has some appeal, as subsection (a)(1) expressly imposes aiding and abetting liability while subsection (a)(2) does not. On closer examination, however, the defendant's proposed construction of section 1324 is incorrect. The aiding and abetting provision in subsection (a)(1) does not impose aiding and abetting liability where such liability would not otherwise exist; it merely establishes different penalties for aiders and abettors than would result under Title 18 in the absence of the aiding and abetting provision. That subsection (a)(2) does not contain an aiding and abetting provision does not mean that a defendant cannot be held liable for aiding and abetting a violation of that subsection. Instead, that silence means only that Congress did not intend to exclude subsection (a)(2) from the general principle embodied in Title 18 that an aider and abettor can receive the same punishment as a principal.

■ To appreciate the function performed by the aiding and abetting provision in subsection (a)(1), it is necessary to review the role of Title 18 and the legislative history of 8 U.S.C. section 1324. Title 18, section 2 provides: "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). The principle embodied by the general aiding and abetting provision is, to say the least, well-settled. *See United States v. Gooding,* 12 Wheat. 460, 25 U.S. 460, 469, 6 L.Ed. 693 (1827). Section 2 of Title 18 has a uniquely broad scope; it typically applies to any criminal statute unless Congress specifically carves out an exception that precludes aiding and abetting liability. *See United States v. Armstrong,* 909 F.2d 1238, 1241 (9th Cir.1990) ("Aiding and abetting is implied in every federal indictment for a substantive offense.").

The legislative history of 8 U.S.C. section 1324 is also instructive. Congress added the language of subsection (a)(2)(B)(ii) regarding smuggling performed for financial gain in section 112 of the Immigration Reform and Control Act of 1986 ("IRCA"). *See* Pub.L. No. 99–603, § 112, 100 Stat. 3359 (1986) (codified at 8 U.S.C. § 1324) (page numbers unavailable). In section 203 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Congress inserted the aiding and abetting language

of subsection (a)(1)(A)(v)(II), amended the penalty provisions in subsection (a)(1)(B) accordingly, added the three-year mandatory minimum sentence for first and second violations of subsection (a)(2)(B)(ii), and imposed five-year minimum and fifteen-year maximum sentences for third and subsequent violations. *See* Pub.L. No. 104–208, § 203, 110 Stat. 3009, at 3009–565 to 3009–567 (1996) (codified at 8 U.S.C. § 1324). Prior to IRCA, section 1324 did not include any additional punishment for smuggling performed for financial gain, did not explicitly delineate a penalty for aiding and abetting smuggling offenses, and established a maximum sentence of five years for each alien brought into the United States. *See* § 1324, Historical and Statutory Notes, 1986 Amendments.

After IRCA but before IIRIRA, then, a defendant convicted of bringing in an alien under subsection (a)(1)(A)(i) (non-commercial) or subsection (a)(2)(B)(ii) (commercial) could be imprisoned for ten years, while a defendant convicted of transporting, harboring, or inducing the entry of an alien under subsections (a)(1)(A)(ii)-(iv), whether such acts were done for commercial purposes or not, was subject to a five-year maximum sentence. Because subsection (a)(1) did not yet include the aiding and abetting provision, a defendant who aided and abetted any of the above offenses could receive the same sentence as a principal in accordance with Title 18. For example, a defendant convicted of transporting an alien within the United States for the purpose of commercial advantage or private financial gain was subject to a five-year maximum term, and an aider and abettor of that defendant also faced a five-year maximum sentence.

After IIRIRA, however, the penalties facing an aider and abettor of certain offenses under subsection (a)(1) changed relative to those of a principal. IIRIRA increases the penalties for commercial alien

smuggling under both subsections (a)(1) and (a)(2). Under subsection (a)(1), a defendant who transports, harbors, or induces entry for the purpose of commercial advantage or private financial gain is subject to a ten-year maximum sentence rather than the five-year maximum under IRCA. *See* § 1324(a)(1)(B)(i). Absent subsection (a)(1)(A)(v)(II), Title 18 would operate to impose on an aider and abettor a ten-year maximum term-the same term a principal would receive-for aiding and abetting those offenses. Given the aiding and abetting provision in subsection (a)(1)(A)(v)(II) and the penalty provisions in subsection (a)(1)(B), however, a defendant who aids or abets a violation of those provisions is only subject to a five-year maximum term, even if the defendant aided and abetted a violation for commercial gain. *See* § 1324(a)(1)(B)(ii).

In the example cited *supra*, for instance, a defendant convicted of transporting an alien within the United States for the purpose of commercial advantage is subject to a ten-year maximum term. But for subsection (a)(1)(A)(v)(II), a defendant who aided and abetted that offense would also face a ten-year maximum term. Under the aiding and abetting provision, however, a defendant who aids and abets the offense only faces a five-year maximum sentence.

Thus, IIRIRA's amendments do not operate to impose aiding and abetting liability where such liability does not otherwise exist. Given the general presumption of Title 18, a defendant could always have been found guilty of aiding and abetting the offenses in subsection (a)(1), even before IIRIRA. Instead, the addition of the aiding and abetting provision in subsection (a)(1)(A)(v)(II) and the corresponding adjustments to the penalty provisions in subsection (a)(1)(B) operate to impose lesser penalties for aiders and abettors of certain offenses than they would normally receive

under Title 18. In other words, the aiding and abetting language in subsection (a)(1) creates an exception to the general rule established by Title 18.

As for subsection (a)(2), IIRIRA increases the penalties facing defendants who bring an alien into the country for commercial purposes but does not provide different penalties for aiders and abettors. Defendants who bring an alien into the United States for commercial advantage or private financial gain are no longer merely subject to a ten-year maximum sentence; they are also subject to a mandatory minimum sentence of three years for first or second violations and a five- to fifteen-year term for third or subsequent violations. Congress did not insert in subsection (a)(2) a provision analogous to subsection (a)(1)(A)(v)(II) that would impose lesser penalties for aiders and abettors. Congress's failure to include such an exception to Title 18 under subsection (a)(2) at the same time that Congress created an exception to Title 18 under subsection (a)(1) and at the same time that Congress increased the penalties under subsection (a)(2) suggests that Congress did not intend to impose differential penalties for aiders and abettors under subsection (a)(2). In other words, subsection (a)(1) represents an exception to the general rule under Title 18 that aiders and abettors are treated the same as principals, while subsection (a)(2) simply applies Title 18 in its typical fashion. The silence in subsection (a)(2) regarding aiding and abetting liability means that Congress did not want the special exception in subsection (a)(1) to apply to subsection (a)(2). A defendant can thus be liable as an aider and abettor under subsection (a)(2) and can receive the same punishment-including the mandatory minimum sentences-that a principal would receive.

▪ That construction of the statute is also consistent with Congress's over-

all purpose in enacting subsection (a)(2). Both IRCA and IIRIRA were designed to increase penalties for those who bring aliens into the United States for commercial purposes. IRCA was intended to expand the scope of section 1324, allowing it to reach employers and other smuggling activity and increasing penalties for smuggling performed for financial gain. *See United States v. Kim,* 193 F.3d 567, 573–74 (2d Cir.1999). Congress regarded IRCA's modifications as "essential in light of recent judicial opinions which have interpreted existing law as not applying to certain activities that clearly are prejudicial to the interests of the United States." H.R.Rep. No. 99–628(I) (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 1986 WL 31950 (Leg. Hist.) (page numbers unavailable) (discussing *United States v. Anaya,* 509 F.Supp. 289 (S.D.Fla.1980) (en banc), *aff'd on other grounds sub nom. United States v. Zayas–Morales,* 685 F.2d 1272 (11th Cir. 1982)). Congress enacted IRCA to make it clear that Congress regarded smuggling performed for commercial gain as particularly worthy of punishment. *See* H.R.Rep. No. 99–628(I) (characterizing the commission of an offense for commercial gain as an "aggravating circumstance[ ]" that warranted a higher maximum sentence). The legislative history of IIRIRA indicates that subsection (a)(1)(A)(v)'s language was designed *"to specify criminal penalties for* those who engage in a conspiracy to violate alien smuggling, inducement, harboring, and transportation prohibitions, and for those who aid and abet such crimes." H.R.Rep. No. 104–828 (1996), 1996 WL 563320 (Leg.Hist.) (page numbers unavailable) (emphasis added).

▪ An interpretation of subsection (a)(2) that did not permit aiding and abetting liability would also be contrary to Congress's policy judgment. Section 1324 makes it clear that Congress regards

bringing an alien into the United States as a more serious offense than transporting an alien within the United States, harboring an alien, or inducing entry of an alien, as illustrated by the higher maximum sentences imposed for bringing in an alien as early as IRCA. It is also evident that Congress regards commercial offenses as more serious than non-commercial offenses, as demonstrated by the higher penalties imposed partly in IRCA and more broadly in IIRIRA. As a result, Congress regards the bringing of aliens into the United States for commercial purposes as the most serious offense, as shown by the mandatory minimum sentences in subsection (a)(2)(B). To interpret section 1324 such that a defendant could be liable for aiding and abetting the less serious violations in subsection (a)(1) (as explicitly provided in the statute) but could not be liable for aiding and abetting the more serious violation of bringing in an alien for commercial purposes in subsection (a)(2) would undermine Congress's belief that the commercial bringing in of aliens is the most serious offense under section 1324. A court should interpret statutes in a manner consistent with the legislature's overall intent. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350–51, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

Thus, given the meaning of section 1324 and Congress's intent in enacting IRCA and IIRIRA, subsection (a)(2) must be interpreted to permit aiding and abetting liability and to subject those found guilty of aiding and abetting a violation of that subsection to the same sentences that a principal would receive. The aiding and abetting provision and the corresponding penalty provisions in subsection (a)(1) create an exception to the general rule established by Title 18. The absence of any similar exception in subsection (a)(2) means that Congress did not intend to exclude aiding and abetting liability for offenses under that subsection. Angwin's

conviction under subsection (a)(2) as an aider and abettor was therefore permissible.

## D. The Sufficiency of the Evidence

Both Angwin and Khamis challenge their convictions on the ground that there was insufficient evidence to support the jury's verdict. An appellate court reviews de novo a district court's denial of a motion to set aside the verdict or for a judgment of acquittal on the basis that the evidence was insufficient. *See United States v. Tucker*, 133 F.3d 1208, 1214 (9th Cir.1998). Consequently, this court must review the evidence presented against the defendants and, viewing the evidence in the light most favorable to the prosecution, determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Deeb*, 175 F.3d 1163, 1168 (9th Cir.1999).

### 1. Angwin's Conviction for Bringing in Illegal Aliens

Angwin does not dispute that there was substantial evidence upon which a jury could have concluded that he was guilty beyond a reasonable doubt. Instead, he argues that the evidence was not sufficient for him to be found guilty of aiding and abetting the bringing of aliens into the United States since the aliens had already entered the country when he picked them up. Angwin also asserts that the United States did not present adequate evidence that he committed the offense for the purpose of commercial advantage or private financial gain.

#### a. Whether the Crime was Already Completed

Angwin asserts that a person cannot aid and abet a completed crime. At most,

Angwin argues, he was guilty of transporting aliens within the United States under section 1324(a)(1)(A)(ii), not aiding and abetting the bringing in of aliens into the country under section 1324(a)(2)(B)(ii).

Angwin's reading strains the meaning of section 1324(a)(2)(B)(ii), which was designed to provide additional penalties for persons involved in commercial smuggling. Under his interpretation, only a person who physically accompanied aliens across the border could be guilty of bringing in aliens. Limiting section 1324(a)(2)(B)(ii) to guides would eviscerate the statute because all of the other participants in a smuggling operation, such as drivers, recruiters in the foreign country, organizers in the United States, and those who place aliens upon their arrival, all of whom are necessary for a smuggling operation to succeed, would escape liability.

Indeed, Angwin cites no authority for the proposition that the crime of smuggling is complete the moment the alien enters the United States. The Second Circuit has explicitly rejected the defendant's argument, concluding that the crime of bringing in aliens, like the smuggling of narcotics, is not complete until the alien at least reaches his immediate destination in the United States. *See United States v. Aslam,* 936 F.2d 751, 755 (2d Cir.1991) ("[S]ection 1324(a)(2) punishes those who participate in the process of bringing illegal aliens into the United States, and that the offense does not end at the instant the alien sets foot across the border."); *id.* ("The illegal importation of aliens, like the illegal importation of drugs, . . . continues at least until the alien reaches his immediate destination in this country.") (citations omitted).

The aliens Angwin transported were traveling to Los Angeles, Angwin met them at a prearranged location shortly after some of them entered the United States, and he immediately helped transport them north. Under those circumstances, a rational jury could easily conclude beyond a reasonable doubt that the offense was not complete and that Angwin was guilty of aiding and abetting the bringing in of aliens into the United States.

### b. Whether the Government Proved Financial Gain

Angwin also claims that the United States did not introduce enough evidence to prove the financial gain element of the smuggling charge. To be guilty under section 1324(a)(2)(B)(ii), a defendant must commit the offense "for the purpose of commercial advantage or private financial gain." *See* § 1324(a)(2)(B)(ii). Angwin asserts that there was inadequate evidence of his personal financial gain such as an agreement to pay or an actual payment of money to him.

Angwin's argument is without merit. The statute does not require evidence of an actual payment or even an agreement to pay. It merely requires that the offense was done for the purpose of financial gain. Given Vincente–Morales' testimony that he expected that he would have to pay for his transportation once he arrived in Los Angeles, the substantial evidence of the defendant's guilt, and the lack of any other possible explanation for Angwin's conduct, the evidence was more than sufficient for a rational jury to conclude beyond a reasonable doubt that Angwin committed the offense for the purpose of private financial gain.

### 2. Khamis's Conviction for Transporting Illegal Aliens

■ Khamis argues that there was insufficient evidence to support her conviction for transporting illegal aliens. When viewing the evidence in the light most favorable to the prosecution, a rational

jury could have found the essential elements of the crime beyond a reasonable doubt.

■ To convict Khamis for transporting an alien under section 1324(a)(1)(A)(ii), the United States had to prove that the aliens named in the indictment were not lawfully in the United States, that Khamis knew or recklessly disregarded the fact that the aliens were not lawfully in the United States, and that Khamis knowingly transported the aliens in order to help them to remain in the United States illegally. *See* 9th Cir.Crim. Jury Instr. 9.2 (2000); *see also United States v. Hernandez,* 913 F.2d 568, 569 (8th Cir.1990).

There is no question that the aliens transported by the defendants were in the United States illegally, and there can be little doubt that Khamis knew or recklessly disregarded the fact that the aliens were not lawfully in the United States. After all, Khamis admitted in her statement to USBP agents that she was aware of the aliens' presence, and the manner in which the aliens entered the motorhome was sufficiently suspicious for a jury to conclude beyond a reasonable doubt that Khamis knew or recklessly disregarded the fact that the aliens were illegally in the country. *See United States v. Loya,* 807 F.2d 1483, 1486 (9th Cir.1987) (holding that circumstantial and indirect evidence such as the place of entry and the furtive behavior of aliens may support an inference that a defendant knew that aliens were illegally in the United States). This defendant is therefore already distinct from defendants charged with alien smuggling who are at least arguably unaware of an alien's presence. *See, e.g., United States v. Esparza,* 876 F.2d 1390, 1393 (9th Cir.1989) (finding that there was insufficient evidence to support a conviction where the defendant was present but there was no evidence that the defendant knew that aliens were hidden in a moving van).

The element that presents a closer question is whether Khamis knowingly transported the aliens in order to help them remain in the United States illegally. Khamis contends that her mere physical accompaniment of Angwin, her awareness of the aliens' presence, and her silence at the USBP checkpoint when asked whether there were other people in the vehicle are insufficient collectively to prove that she intended to help the aliens remain in the United States illegally. In her view, that evidence also supports an inference that she was duped into accompanying Angwin and did not intend to assist him in transporting the aliens.

Standing alone, Khamis' presence in the motorhome would not constitute sufficient evidence to support her conviction. *See* 9th Cir.Crim. Jury Instr. 6.9 (noting that "[m]ere presence at the scene of a crime or mere knowledge that a crime is being committed is not sufficient to establish that the defendant committed the crime … unless you find that the defendant was a participant and not merely a knowing spectator"); *Esparza,* 876 F.2d at 1392 (finding that a defendant's presence in one vehicle was not a sufficient basis to infer that he was aware of or participated in a conspiracy to transport aliens in a second accompanying vehicle where there was no evidence that the defendant knew that aliens were hidden in the second vehicle). Even Khamis' presence in the motorhome combined with her knowledge of the aliens' presence might not in itself provide sufficient evidence to persuade a jury beyond a reasonable doubt that she knowingly aided and abetted the transportation of the aliens in order to help them remain in the United States illegally. If the only additional piece of evidence against Khamis had been her failure to reveal the aliens' presence at the checkpoint when asked whether she and Angwin were the only passengers in the motorhome, we would be compelled to decide whether her presence,

knowledge, and silence constituted sufficient evidence.

This Court need not make that determination, however, as there was other evidence against Khamis from which a reasonable jury could have found beyond a reasonable doubt that Khamis knowingly aided and abetted the transportation of the aliens with the intent to help them remain in the United States illegally.

 First, Khamis exhibited nervousness at the checkpoint through her failure to make eye contact with Agent Mikuski. When Mikuski asked Angwin and Khamis if they were United States citizens, Angwin answered but Khamis did not until Mikuski posed the question to her directly. Mikuski also noted that Khamis looked straight ahead and never looked at him, even when he was talking to her. Khamis was also silent when Mikuski asked if the defendants were the only occupants of the vehicle. Because Khamis was not yet in custody, it was proper for the prosecutor to comment on her silence at the primary inspection area as constituting substantive evidence of her guilt. *See United States v. Oplinger*, 150 F.3d 1061, 1066–67 (9th Cir. 1998).[6]

Second, Khamis made a statement to Agent Searle that was inconsistent with Angwin's testimony at trial with respect to certain details about their travel such as the time they left the rest area and why they stopped along the highway and that otherwise failed to corroborate Angwin's version of the events.

Third, there was indirect evidence that Khamis waved to the aliens as if to encourage them to enter the motorhome. When the defendants stopped along the highway, Khamis exited on the passenger side and toward the front of the vehicle, as evidenced by her statement to Searle, Angwin's testimony, and Vincente–Morales' testimony. Vincente–Morales testified that he saw a hand near the front and to

---

**6.** We have previously noted that a prosecutor may not use a defendant's post-arrest, pre-*Miranda* warning silence as substantive evidence of her guilt. *See United States v. Whitehead*, 200 F.3d 634, 639 (9th Cir.2000). However, Khamis was not in custody at the primary inspection area of the checkpoint. *See United States v. Leasure*, 122 F.3d 837, 840 (9th Cir.1997) ("In most cases, the earliest that a person could be in custody is at the point when she is moved into a secondary inspection area and asked to exit her vehicle while it is searched."); *see also United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir.2001) ("It is well recognized that special rules apply at the border."); *id.* at 1100–01 (holding that an act of physical confinement beyond detention is required for a defendant to be in custody at a border checkpoint). As a result, her *Miranda* rights had not yet attached, and the prosecutor acted properly in commenting that her silence at the primary inspection area was substantive evidence of her guilt.

The pendency of en banc proceedings in *United States v. Velarde–Gomez*, 224 F.3d 1062 (9th Cir.2000), *reh'g en banc granted*, 250 F.3d 1288 (2001), does not command a different result. In *Velarde–Gomez*, a panel of our court held that a prosecutor *may* comment on a defendant's post-arrest, pre-*Miranda demeanor* since evidence of one's physical characteristics or one's mood is ordinarily nontestimonial. *See* 224 F.3d at 1070 ("[E]vidence of [the defendant's] physical reactions and emotional state is evidence of his physical characteristics rather than communicative evidence. We hold that such evidence is not testimonial and thus its admission into evidence does not violate [the defendant's] Fifth Amendment rights."). While that holding must be regarded as unresolved in light of our en banc proceedings, that case involved statements made when the defendant was in custody. *See id.* at 1069 ("The government concedes that Velarde–Gomez was in custody and had not received *Miranda* warnings at that time. Thus, this case involves comments on post-arrest, pre-*Miranda* silence and demeanor."). Nothing in *Velarde–Gomez* undermines our prior cases ruling that a prosecutor may comment on a defendant's *pre*-arrest silence since her *Miranda* rights are not implicated until she is in custody. *See Oplinger*, 150 F.3d at 1066–67.

the side of the motorhome that was signaling to the group. While Vincente–Morales admittedly could not tell whether the person was a man or a woman because he was moving quickly, combined with Angwin's testimony regarding his own location, the location of the Latino men who were speaking with Angwin, and Khamis's location, a rational jury could have believed that Khamis was the person waving the aliens toward the motorhome. That Angwin and the guide were also waving at various times would not preclude an inference that Khamis was the person waving toward the aliens, especially given Angwin's testimony that he was near the rear of the motorhome when the aliens entered the vehicle.

From this range of evidence—Khamis' accompaniment of Angwin, her knowledge of the aliens' presence, her nervousness and failure to disclose the aliens' presence at the checkpoint, the inconsistencies between Angwin's testimony and Khamis' statement to Searle, and the indirect evidence that Khamis waved to the aliens—a rational jury could have found beyond a reasonable doubt that Khamis intended to provide cover for Angwin and that she acted with the intent of helping the aliens remain in this country illegally. Indeed, our court and others have upheld convictions under 8 U.S.C. section 1324 that were challenged on sufficiency of evidence grounds with similar indicia of guilt. *See United States v. Hernandez–Guardado,* 228 F.3d 1017, 1023 (9th Cir.2000) ("The Government need not prove by direct evidence a defendant's intent to further the presence of an illegal alien."); *U.S. v. Hernandez–Franco,* 189 F.3d 1151, 1155–56 (9th Cir.1999) (finding that a jury could have inferred that a defendant knowingly transported aliens where a witness testified that a person matching the defendant's description observed aliens being loaded into the vehicle); *id.* at 1158 ("Duress does not negate the *mens rea* re-

quired for a violation of section 1324(a)(1)(A)(ii). Appellant could intend to drive a truck with undocumented aliens to further their illegal presence in the United States, but act in that manner because someone had a gun to his head."); *United States v. Chavez–Palacios,* 30 F.3d 1290, 1294 (10th Cir.1994) (finding that a defendant's presence in a vehicle, knowledge that aliens were present, and awareness that he knew that he might "get in trouble" for driving the van constituted sufficient evidence); *id.* ("Although the defendant offered evidence of his so-called 'mere presence' defense, our task is not to review matters of credibility and assess the weight of the evidence.... [T]he jury's finding of guilt means that it found that the defendant had the intent to further the aliens' presence in this country."). Her conviction was therefore supported by sufficient evidence.

## E. The Upward Adjustment of Angwin's Sentence

 Finally, Angwin challenges his sentence, in which the district court upwardly adjusted his offense level pursuant to Guidelines section 2L1.1(b)(5) due to the substantial risk of death or serious bodily injury to another person he created. Consistent with the presentence report, the district court found that the motorhome was dangerously overcrowded and that the aliens were not restrained by seatbelts. A district court's application of the Guidelines to the facts of a case is reviewed for an abuse of discretion. *See United States v. Frega,* 179 F.3d 793, 811 n. 22 (9th Cir.1999), *cert. denied,* 528 U.S. 1191, 120 S.Ct. 1247, 146 L.Ed.2d 105 (2000). The district court's factual findings are reviewed for clear error. *See United States v. Maldonado,* 215 F.3d 1046, 1050 (9th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1141, 148 L.Ed.2d 1004 (2001).

Angwin argues that he did not create a substantial risk of death or serious bodily

injury. He contends that the aliens were not confined in any compartments, that he drove carefully, and that the vehicle was not overloaded. In Angwin's view, only extreme indifference to aliens' safety warrants an enhancement. His conduct, he argues, was more akin to *United States v. Trinidad De La Rosa*, 916 F.2d 27 (1st Cir.1990), in which the First Circuit found that the district court erred in applying the adjustment even where the defendant had participated in transporting over fifty aliens on a thirty-four foot boat. *See* 916 F.2d at 30–31 (noting that the adjustment is appropriate for cases involving "glaring examples of inhumane and ruthless conduct" but reversing the district court's upward adjustment since there was insufficient evidence of inhumane treatment).[7]

The defendant's argument is not compelling. There was ample evidence in the record from which the district court could conclude that the aliens driven by Angwin were placed at substantial risk of serious injury or death. With fourteen aliens, Khamis and Angwin in the motorhome, the vehicle was carrying sixteen people, even though it was only rated to hold six. The aliens were crowded into the motorhome in small compartments; three of the aliens were hiding in the shower, four were in the bathroom, two were crouching under the table, one was slouched over in a closet, and one was hiding in a small compartment under the bed. None of the aliens was seated, let alone wearing a seatbelt. Angwin even testified that the motorhome was very top-heavy, that he was worried the vehicle could flip over, and that he was concerned about driving on the narrow highway with steep shoulders. Since the district court did not commit clear error in finding those facts, it is difficult to conclude that the court abused its discretion in applying the adjustment.

Moreover, it is clear that a district court does not abuse its discretion by applying the upward adjustment in such a factual context. The commentary to Guidelines section 2L1.1 specifically notes that transporting an excessive number of passengers in a vehicle presents a risk of serious bodily injury or death:

> Reckless' conduct to which the adjustment from subsection (b)(5) applies includes a wide variety of conduct (*e.g.*, transporting persons in the trunk or engine compartment of a motor vehicle, *carrying substantially more passengers than the rated capacity of a motor vehicle or vessel*, or harboring persons in a crowded, dangerous, or inhumane condition).

USSG § 2L1.1, commentary n. 6 (emphasis added). Angwin's argument is particularly unavailing in light of *United States v. Hernandez–Guardado*, 228 F.3d 1017 (9th Cir.2000), in which this Court recognized that overloading a vehicle can place its occupants at risk of serious bodily injury. The risk to Angwin's passengers, with sixteen passengers in a vehicle rated for six, was even more pronounced than the risk present in *Hernandez–Guardado*, with only two or three extra passengers in each vehicle. The district court therefore did not abuse its discretion in applying the upward adjustment.[8]

---

**7.** *Trinidad De La Rosa* was predicated on an older version of the Guidelines that required both inhumane treatment and the transportation of a large number of aliens to warrant the enhancement. *See United States v. Reyes*, 927 F.2d 48, 52 n. 2 (1st Cir.1991) (noting that *Trinidad De La Rosa* was superseded by a newer version of the Guidelines).

**8.** The defendant complains that concluding that the upward adjustment was appropriate in this instance will mean that virtually every alien transportation case will be subject to the upward adjustment. *See* Angwin Reply at 8. Whether the upward adjustment should ultimately apply is a matter best left to the discretion of the district courts in individual cases. *See Buford v. United States*, 532 U.S. 59, ——,

### III. CONCLUSION

Because the district court did not err in refusing to sever the defendants' trial, excluding Angwin's proffered evidence of habit, determining that aiding and abetting liability is permissible under 18 U.S.C. section 2 for bringing in aliens, finding that there was sufficient evidence for the convictions, and upwardly adjusting Angwin's sentence, the district court's orders are

AFFIRMED.

FERGUSON, Circuit Judge, concurring and dissenting:

I concur in the affirmance of the conviction of Ted Angwin. I dissent regarding Christine Khamis. I do not believe that there was sufficient evidence to convict her of transporting illegal aliens. To convict Khamis, the Government had to prove beyond a reasonable doubt that she is guilty. *United States v. Barajas–Montiel,* 185 F.3d 947, 954 (9th Cir.1999). However, even when the evidence is viewed in the light most favorable to the prosecution, *United States v. Toomey,* 764 F.2d 678, 680 (9th Cir.1985), the facts of this case do not support a guilty verdict. Khamis' conviction is founded upon mere assumptions, and I cannot agree that she was guilty beyond a reasonable doubt.

"We have recognized that a conviction under this section requires more than just the defendant's knowledge or reckless disregard of the fact that the alien transported was illegally present in the United States: the Government must also prove that the defendant 'intended to further the alien's illegal presence in the United States.' " *United States v. Hernandez–Guardado,* 228 F.3d 1017, 1022 (9th Cir. 2000) (quoting *United States v. Hernandez–Franco,* 189 F.3d 1151, 1155 (9th Cir. 1999) (citations omitted)). None of Kham-

is' actions demonstrate this level of criminal intent. *See United States v. Nguyen,* 73 F.3d 887, 893 (9th Cir.1995).

The majority states that "there can be little doubt that Khamis knew or recklessly disregarded the fact that the aliens were not lawfully in the United States." Maj. op. at 11892. The majority seems to believe that Khamis' mere presence in the motor home infers her knowledge of the particular criminal activity of which she was accused. Khamis' presence in the motor home proves nothing. The jury instructions clearly stated that more was required:

> It is not enough that the Defendant merely associated with that person, or was present at the scene of the crime, or unknowingly or unintentionally did things that were helpful to the principal. The evidence must show beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping that person commit the offense of bringing in ... illegal aliens for financial gain.

When looking at the facts, it is unclear whether Khamis knew that the people in the motor home were illegal aliens, much less whether she was an active participant in a scheme to transport illegal aliens.

There was no evidence that Khamis had prior knowledge that Angwin intended to transport aliens. Khamis was traveling with Angwin, an old family friend, because she believed they were looking at business property. When the motor home stopped in the desert, Khamis got out to take her dog for a walk. She saw no one. When she returned to the motor home, she was told by Angwin, "Don't ask any questions and look straight ahead." She kept her eyes forward and heard and felt people

121 S.Ct. 1276, 1280 (2001) (noting that appellate courts should deferentially review district courts' factual application of the Guidelines).

getting into the vehicle. The aliens testified that they were hidden inside the motor home during the entire trip.[1] There was no testimony that Khamis actually saw the aliens until the motor home was searched at the border checkpoint.

Hilario Vincente–Morales, one of the aliens, testified that the only person he saw other than the people in his group was Angwin. The only testimony indicating that the aliens knew someone else might be present was Vincente–Morales' statement that he saw a hand waving. This testimony is ambiguous at best. Vincente–Morales did not actually see the person who was waving the hand, and he could not tell if the hand belonged to a male or female because he was distracted—the hand was toward the front of the motor home, he was running through tall grass that partially blocked his view, there were fourteen other aliens running with him, and people were tripping in their rushed attempt to get into the back of the motor home. Testimony about a briefly-glimpsed, unidentifiable hand does nothing to support Khamis' conviction. Moreover, there was testimony that two other people at the motor home were waving: both Angwin and one of the aliens reportedly waved their arms in the air. It is difficult to believe that Vincente–Morales did not see either of these hand waves and yet spotted one at a far greater distance from the motor home. It seems most likely that he failed to properly identify the location of the hand wave.

The closest that any testimony puts Khamis to the ambiguous hand wave is 75 feet. No testimony was presented as to the meaning of the wave. There simply is not enough evidence for a jury to infer beyond a reasonable doubt that Khamis was the person waving. Even assuming she did wave, there are no facts to indicate what the wave meant. Vincente–Morales testified that the wave consisted of a hand up in the air, above the person's head, moving from side to side. Was this a wave encouraging the people to get into the motor home? Was this a person shooing away desert bugs? Was there some other meaning altogether to the wave? Was it actually a wave Vincente–Morales saw as he was running through the tall grass? There are just too many unknowns to support a guilty verdict on this basis.

The majority's citation to *United States v. Loya*, 807 F.2d 1483, 1486 (9th Cir.1987), does not strengthen the Government's case. While circumstantial and indirect evidence may support an inference that a defendant knew that aliens were illegally in the United States, it pre-supposes that the person actually saw the aliens and spoke to them. In *Loya*, there was evidence that the defendant met with the illegal aliens at the border. *Id.* at 1488–89. Similarly, in *United States v. Herrera–Medina*, 609 F.2d 376, 378 (9th Cir.1979), cited by *Loya* as support for its holding, 807 F.2d at 1486, it was uncontroverted that the defendants actually saw and spoke to the people they were transporting. There is absolutely no evidence that Khamis actually saw the aliens either outside or inside the motor home until it was checked by the border patrol agents, and there is no evidence that she spoke to them at any time. Assuming she did see the aliens and knew they were in the motor home, presence in the vehicle is insufficient to infer guilt of transporting illegal aliens. *United States v. Esparza*, 876 F.2d 1390, 1392 n. 2 (9th Cir.1989); Maj. op. at 11893.

Khamis' behavior at the checkpoint does nothing to strengthen the other evidence presented by the prosecution. When the motor home arrived at the border checkpoint, border patrol agent Mikuski testi-

---

1. Agent Mikuski testimony corroborates this.

fied that he became suspicious because Angwin appeared nervous and Khamis never looked at him or spoke to him unless he directly asked her a question. The questions initially posed by Mikuski were general questions directed at both Angwin and Khamis and did not require a response from each of them. When Mikuski asked them if they were citizens of the United States only Angwin answered. There is nothing even remotely incriminating about Khamis not answering this question when Angwin had just responded for both of them. Khamis' silence in this situation proves nothing.

The majority suggests that Khamis' conviction is also supported by evidence that she did not look at Mikuski when he was asking questions. However, the most we can infer from this is that she knew she was in the presence of a crime. The majority has already indicated that this knowledge is not enough to support her conviction. Maj. op. at 11894.

The final piece of evidence relied upon by the majority as support for Khamis' conviction is that Khamis made a statement to Agent Searle that was inconsistent with Angwin's testimony about the details of their travel. It is unclear exactly what inconsistencies the majority found, but they apparently eluded the Government. There is no mention of these inconsistencies in the Government's argument that there was sufficient evidence for Khamis' conviction. Assuming that there were inconsistencies, all this means is that she did not corroborate the testimony of a guilty person. This is hardly enough to find guilt beyond a reasonable doubt.

The evidence presented by the prosecution builds, at best, a fragile foundation upon which to rest Khamis' conviction and creates, if anything, an inference that it is slightly more probable that Khamis is guilty. "Slightly more probable" does not satisfy the beyond-a-reasonable-doubt

standard required for a conviction in a criminal case. *Jackson v. Virginia*, 443 U.S. 307, 320, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The Supreme Court has held that "[a]ny evidence that is relevant—that has any tendency to make the existence of an element of a crime slightly more probable than it would be without the evidence, ... could be deemed a 'mere modicum.' But it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Id.* (citation omitted). All the evidence presented against Khamis equates to a "mere modicum" that crumbles under the scrutiny of the reasonable doubt standard. It does not support a conviction beyond a reasonable doubt.

I would therefore reverse her conviction.