UNITED STATES of America,
Plaintiff–Appellee,

v.

Victor RAMIREZ–MARTINEZ,
Defendant–Appellant.

No. 00–50681.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 7, 2001.

Filed Dec. 5, 2001.

Carla V. Gomez (briefed), Federal Defenders of San Diego, San Diego, California, for the appellant.

Todd W. Burns (briefed and argued), Federal Defenders of San Diego, San Diego, California, for the appellant.

Patrick K. O'Toole, United States Attorney, Audra S. Ibarra (briefed), Assistant U.S. Attorney, and Brian M. Pearce (argued), Assistant U.S. Attorney, San Diego, California, for the appellee.

Before: HALL and TROTT, Circuit Judges, and WINMILL, District Judge.*

* The Honorable B. Lynn Winmill, Chief Judge for Idaho District Court, sitting by designation.

TROTT, Circuit Judge:

Due to some creative lawyering, this seemingly run-of-the-mill alien smuggling case requires us to confront a melange of novel legal issues.

A jury convicted Defendant–Appellant Victor Ramirez–Martinez ("Ramirez") of two counts of attempting to transport and transporting undocumented aliens, in violation of 8 U.S.C § 1324(a)(1)(A)(ii) (2000), and one count of aiding and abetting bringing to the United States an undocumented alien for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2 (2000). The district court, District Judge Barry T. Moskowitz, sentenced Ramirez to forty-four months in prison followed by three years of supervised release.

Launching numerous challenges, Ramirez appeals his three convictions and his sentence. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291 (2000) and 18 U.S.C. § 3742 (2000). For the reasons expressed below, we affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

### A. Offense Conduct

On March 21, 2000, agents from the Immigration and Naturalization Service ("INS"), responding to a call, discovered Ramirez and twenty-three others in and around an apparently stranded van located in a remote desert area of Ocotillo, California, approximately five miles north of the United States–Mexico border. Upon seeing the approaching agents, the twenty-four people ran, but the agents were able to apprehend all the fleeing suspects.

Ramirez, the only person who ran north, agreed, after having been advised of his *Miranda* rights, to provide a statement to authorities. Ramirez explained that on the day in question he had traveled from Fontana, California to El Centro, California, where he picked up the van from "some guy." Ramirez then followed the "guy" from El Centro to Ocotillo, where he was instructed to wait in the van for several undocumented aliens who were trekking across the Mexican desert into the United States and who wanted to travel north. Ramirez admitted that he was supposed to be paid for his efforts, and when asked how much, he told the agents, "They told me about $50 per person."

### B. Two Undocumented Aliens

Jesus Gomez–Flores ("Gomez") and Pedro Santiago–Sariyana ("Santiago") were two of the undocumented aliens near the van when the agents approached. Both men testified at Ramirez's trial about their respective journeys from Mexico to the United States.

Gomez testified that about two days before he was apprehended, he traveled by bus from his hometown of Guanajuato, Mexico to Mexicali, Mexico. In downtown Mexicali, Gomez told a man (not Ramirez) that he wanted to cross the border and head to Los Angeles. The unidentified man told Gomez that he would have to pay for being smuggled to Los Angeles from Mexico. Gomez and the man rode a local bus heading closer to the border, and at a particular stop, the man instructed Gomez to become part of a group of people that had already congregated there. The group of about twenty traveled together on foot through the Mexican desert, across the border, and into the United States. Gomez was unsure whether a guide led the group. However, Gomez told the jury that after crossing into the United States, a driver with a van was waiting for them, and each member of his group got into the

van. Gomez stated that he had never seen Ramirez before.

Santiago's journey was a little different from Gomez's. Santiago testified that, like Gomez, he went to Mexicali in hopes of finding someone to help him enter into the United States. Unlike Gomez, however, Santiago was unable to set up arrangements. After spending the evening at a bus depot, Santiago came across a group of five or six men who also had failed to secure border crossing arrangements. They decided anyway to attempt the trek across the desert on foot. While walking, Santiago's group saw a larger group of about twenty people ahead of them at a distance. This was Gomez's group. Santiago testified that his small group was not part of the larger group, and that he actually tried to hide from the larger group. At some point after crossing into the United States, the larger group came upon a van that was parked off of a freeway. This was Ramirez's van. When members of the larger group began running to the van, Santiago's smaller group made a break for the vehicle as well. Santiago managed to finagle his way into the van through its rear door. Like Gomez, Santiago testified that he never saw Ramirez before.

## C. Indictment

The government charged Ramirez in a five count indictment. Counts 1 and 2 charged Ramirez with aiding and abetting bringing to the United States two undocumented aliens, Jesus Gomez and Pedro Santiago, for financial gain. *See* 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. Counts 3 and 4 charged Ramirez with attempting to transport and transporting the same two undocumented aliens within the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(ii). Count 5 charged Ramirez with being an alien who illegally

reentered the United States after having been deported. *See* 8 U.S.C. § 1326 (2000).

## D. Pre–Trial Proceedings

Ramirez pled guilty to Count 5 of the indictment, but not guilty to Counts 1 through 4. Prior to trial, Ramirez moved to dismiss the remaining four counts on assorted grounds. These arguments form the heart of the instant appeal, and we set forth each claim in detail below. The district court rejected each of Ramirez's arguments, and refused to dismiss the indictment.

During jury selection, Ramirez's attorney objected to three of the government's peremptory challenges, arguing that the prosecutor invoked them in a racially discriminatory manner. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court stated on the record that he thought the issue was close, but sustained two of Ramirez's three objections. As a "remedy" for the *Batson* violation, Judge Moskowitz returned to the venire the two previously-struck jurors and returned to the government its two peremptory challenges. After eventually selecting a jury, the case went to trial.

## E. Trial

At trial, the government called several witnesses to the stand, including Jesus Gomez, Pedro Santiago, and the investigating and arresting officers. The government also introduced into evidence Ramirez's inculpatory statement.

At the close of the government's case, Ramirez moved for a judgment of acquittal on Counts 1 and 2 under Federal Rule of Criminal Procedure 29. *See* FED. R. CRIM. P. 29. Ramirez claimed that the government's evidence failed to prove that he had anything to do with "bringing to"

the United States either Gomez or Santiago. The district court agreed, but only in part. In the court's words, "[Santiago] crashed the party so to speak" because he was not part of any pre-existing, organized group that crossed the border with arrangements to be picked up and driven north, nor was he an invited passenger in Ramirez's van. Judge Moskowitz continued: "I don't see how a reasonable jury could find that the defendant or any group he was working with or aiding and abetting was bringing in ... Mr. Santiago.... If someone else brings him in and the defendant doesn't know that he is aiding and abetting that other person, I just don't see there can be a conviction on that count." Accordingly, the district court granted Ramirez's motion for a judgment of acquittal on Count 2, which involved Santiago.

In contrast, the district court concluded that a reasonable juror could draw an inference from Gomez' testimony that he was part of a group brought into the United States by an organization of people of which Ramirez was a part. Therefore, the court refused to grant a judgment of acquittal on Count 1, pertaining to Gomez.

The jury convicted Ramirez on Counts 1, 3, and 4.

**F. Sentencing**

At sentencing, the Probation Office recommended a base offense level of twelve, see U.S.S.G. § 2L1.1(a)(2), and, among other adjustments, a two-level upward adjustment for intentionally or recklessly creating a substantial risk of death or serious bodily injury. See U.S.S.G. § 2L1.1(b)(5). Ramirez unsuccessfully objected to the two-point upward adjustment. After computing Ramirez's criminal history as category IV, the court sentenced Ramirez to forty-four months in prison on each count, set to run concurrently, followed by three years of supervised release. For Ramirez's conviction on Count 5, to which he had pled guilty, the court sentenced him to twenty-one months in prison to run concurrent to the forty-four month sentences for Counts 1, 3, and 4.

## DISCUSSION

Ramirez challenges his convictions and sentence on several grounds. First, he argues that the district court erred when it "remedied" the government's *Batson* violation by returning to the government its two objectionable peremptory challenges. Second, Ramirez launches a two-pronged attack on his conviction under Count 1. He claims that the government cannot charge a defendant with aiding and abetting under § 1324(a)(2)(B)(ii), and even if it could, the evidence adduced at trial utterly fails to link him to any "bringing to" offense with respect to Jesus Gomez. Third, Ramirez contends that Counts 3 and 4 were duplicitous because each count charged both attempting to transport and actual transporting. Finally, Ramirez argues that the district court erred by adjusting his base offense level upward by two levels for intentionally or recklessly creating a substantial risk of death of serious bodily injury. See U.S.S.G. § 2L1.1(b)(2)(A).

As discussed below, we hold that (1) the court's *Batson* remedy was proper under the circumstances; (2) the government may charge a defendant as an aider and abettor with a "bringing to" offense, and the evidence at trial demonstrates that Ramirez acted in concert with others to bring Jesus Gomez to the United States; (3) Counts 3 and 4 are duplicitous because they each charge both attempt to transport and completed transportation, and this pleading error went unremedied; and (4) the two level upward adjustment was warranted by the facts. Accordingly, we AFFIRM in part and REVERSE in part.

## A. *Batson* Remedy

During jury selection, Ramirez objected to three of the government's peremptory challenges, claiming that the government invoked the challenges in a racially discriminatory manner. Though the district court thought it was a "close case," it sustained two of Ramirez's three challenges. As a "remedy" for the government's *Batson* violation, the district court (1) returned the two previously struck jurors to the jury venire and (2) returned to the government its two peremptory challenges. Ramirez challenges the district court's choice of remedy.

### 1. Standard of Review

■ We review for an abuse of discretion a district court's selected remedy for a *Batson* violation. *See Batson*, 476 U.S. at 99 n. 24, 106 S.Ct. 1712; *Koo v. McBride*, 124 F.3d 869, 872 (7th Cir.1997) ("Through [*Batson*'s] discussion, the Supreme Court made it clear that the fashioning of a remedy is a matter upon which state courts are to be accorded significant latitude."); *McCrory v. Henderson*, 82 F.3d 1243, 1247 (2d Cir.1996) (holding that the "error is remediable in any one of a number of ways").

### 2. Analysis

■ Ramirez contends that the district court's "remedy" was no remedy at all— by returning to the government its two objectionable peremptory challenges, the government was neither punished nor deterred from re-using its strikes in a racially discriminatory manner. We respectfully disagree.

"In fashioning a remedy for any constitutional violation, a court ought to take as its touchstone the basic proposition that the nature of the remedy must be determined by the nature and the scope of the constitutional violation." *Koo*, 124 F.3d at 873 (citing *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977)). "It is also necessary to take into account the practicalities of the situation." *Id.*

In this case, although the district court ultimately sustained two of Ramirez's three objections to the government's use of peremptory challenges, it noted for the record that it was an extremely "close case." Indeed, Judge Moskowitz candidly stated: "I have to say I am bordering on changing my ruling because I think it is such a close case ... I will say that I could be in error in saying that the government improperly used its peremptory challenges." The "scope" of the violation, therefore, was not great, and the record reveals no evidence of egregious bad faith or maliciousness on the part of the prosecutor. There was therefore little reason to "punish" the government. Moreover, presumably Ramirez wanted the two improperly excused jurors returned to the venire, or he would not have objected to the government's striking them. By putting the two jurors back on the venire, the district court granted Ramirez's wish and also assured the fair selection of an impartial jury of Ramirez's peers. *See Darbin v. Nourse*, 664 F.2d 1109, 1113 (9th Cir.1981). Finally, the district court was in a position to monitor the government's use of its two returned peremptory challenges and to ensure that they were exercised in a constitutionally acceptable fashion.

Under these circumstances, the district court appropriately exercised its discretion when it remedied a *Batson* violation by returning the previously excused jurors to the venire and by returning the two objectionable peremptory strikes to the government.

## B. Accessory Liability Under § 1324(a)(2)

Count 1 of the indictment charged Ramirez as an aider and abettor with bring-

ing to the United States an undocumented alien, Jesus Gomez, for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. Before trial, Ramirez argued that the government cannot charge a defendant as an aider and abettor under § 1324(a)(2), and asked the court to dismiss the indictment. The district court denied his request.

### 1. Standard of Review

■ A trial court's decision to deny a motion to dismiss an indictment based on the interpretation of a federal statute is reviewed de novo. *United States v. Dahms*, 938 F.2d 131, 133 (9th Cir.1991).

### 2. Analysis

■ Section 2(a) of Title 18 does not define a separate offense but rather makes it unlawful to aid or abet another in the commission of a substantive offense. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). "The aiding and abetting provision of 18 U.S.C. § 2 . . . is applicable to the entire criminal code" unless Congress plainly says otherwise. *See United States v. Jones*, 678 F.2d 102, 105 (9th Cir.1982); *accord United States v. Hill*, 55 F.3d 1197, 1206 (6th Cir.1995); *United States v. Pino–Perez*, 870 F.2d 1230, 1233 (7th Cir. 1989); *United States v. Falletta*, 523 F.2d 1198, 1200 (5th Cir.1975).

■ Ramirez acknowledges this principle, but claims that Congress intended to exclude the general aiding and abetting statute from 8 U.S.C. § 1324(a)(2), the statute at issue in his case. He focuses on the fact that Congress specifically criminalized aiding and abetting acts under § 1324(a)(1), but included no similar provision for acts under § 1324(a)(2). *Compare* 8 U.S.C. § 1324(a)(1)(A)(v)(II) *with* 8

U.S.C. § 1324(a)(2). We reject this argument because we have already decided in another well-reasoned case that it has no merit. *See United States v. Angwin*, 263 F.3d 979 (9th Cir.2001).

### C. The "Bringing To" Offense

Count 1 of the indictment charged Ramirez as an aider and abettor with bringing to the United States an undocumented alien, Jesus Gomez, for financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. Ramirez moved to dismiss the indictment and later for a judgment of acquittal, claiming that he could not be convicted as an aider and abettor because the "bringing to" offense was already completed before he encountered Gomez in the desert of Ocotillo. The district court denied his requests.

### 1. Standard of Review

■ We review de novo the district court's decision to deny a motion to dismiss an indictment based on the interpretation of a federal statute. *See Dahms*, 938 F.2d at 133; *see also United States v. Kakatin*, 214 F.3d 1049, 1051 (9th Cir. 2000) (reviewing de novo a district court's construction of a statute). In determining whether the evidence was sufficient to sustain a conviction, we review the evidence in the light most favorable to the government and must decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Shirley*, 884 F.2d 1130, 1134 (9th Cir.1989) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

### 2. Analysis

■ Ramirez correctly observes that a defendant cannot be convicted of aiding and abetting a completed offense. *See United States v. Nelson*, 137 F.3d 1094,

1105–06 (9th Cir.1998); *see also* NINTH CIR. MODEL JURY INSTR. 5.1 (2000) (stating that an element of an aiding and abetting crime is that "the defendant acted before the crime was completed"). According to him, a "bringing to" offense under § 1324(a)(2) is complete once the undocumented alien crosses the border of the United States, and does not continue thereafter. From these two propositions, Ramirez claims that his conviction under Count 1 cannot stand because the evidence adduced at trial showed that he did not encounter Gomez until after Gomez had crossed the border—until after the "bringing to" offense was complete.

The government concedes that a defendant cannot be convicted of aiding and abetting a completed offense. However, according to the government, a "bringing to" offense, although complete once the alien crosses the border, continues until the alien reaches his "immediate destination" inside the United States. Because Gomez had not reached his immediate destination when he encountered Ramirez in the desert of Ocotillo, California, the "bringing to" offense was continuing, and Ramirez's subsequent actions subject him to criminal liability as a principal without relying on accessory liability.

Ramirez's argument is largely disposed of by our decision in *Angwin.* In that case, we embraced the concept that a person could be guilty of aiding and abetting the crime of bringing an alien to the United States. In illuminating this idea, we relied on the Second Circuit's opinion in *United States v. Aslam,* 936 F.2d 751, 755 (2nd Cir.1991), which holds that the crime of bringing in aliens is not complete until the alien reaches his immediate destination in the United States.

■ Moreover, if evidence adduced at trial demonstrates that a defendant acted before the "bringing to" offense was com- pleted, then the defendant may surely be properly convicted of aiding and abetting. *See* NINTH CIR. MODEL JURY INSTR. 5.1 (2000) (stating that an element of an aiding and abetting crime is that "the defendant acted before the crime was completed"). When a defendant does not physically accompany the undocumented alien across the United States border, for example, the govern- ment can still prove that the defendant acted before the offense was completed by showing, for instance, that the defendant was part of some "concerted action" to bring the aliens to the United States. As the Fifth Circuit put the matter: "If what the evidence showed [the defendant] did in concert with other accused encouraged the latter unlawfully to bring the aliens into and land them in the United States, he aided and abetted them in so doing." *Smith v. United States,* 24 F.2d 907, 907 (5th Cir.1928); *see also Pinkerton v. Unit- ed States,* 328 U.S. 640, 646, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946) ("[S]o long as the partnership in crime continues, the part- ners act for each other in carrying it for- ward."); *United States v. Merkt,* 794 F.2d 950, 953 (5th Cir.1986) (where evidence shows a previous agreement between de- fendant and another person to bring aliens to the United States, the defendant is guilty under § 1324(a)(2) even if she does not accompany the aliens across the bor- der).

■ The evidence produced at Ra- mirez's trial, when taken in the light most favorable to the prosecution, shows that he was part of a concerted effort to bring undocumented aliens, including Jesus Go- mez, to the United States. Gomez testi- fied that in Mexicali, Mexico, he made arrangements with a man to be smuggled into the United States. The man told Gomez he would have to pay for his safe passage once he arrived in Los Angeles. The man directed Gomez to a group of

people, and that group then trekked together on foot across the .Mexican desert into the United States. Soon after crossing the border, the group encountered Ramirez, who was waiting for them in a van parked in a remote area off the freeway. All twenty people in the group ran to and entered the van without the slightest objection from Ramirez.

For his part, Ramirez admitted that he agreed with "some guy" to transport illegal aliens to Los Angeles. Ramirez explained that he picked up the van earlier in the day in El Centro, California and then followed the man to a place in Ocotillo, where he was supposed to wait for a group of undocumented aliens who had just illegally crossed the United States border. When asked how much he was to be paid "for driving the illegal aliens," Ramirez unhesitatingly responded: "They told me about $50 per person."

From these facts, a rational jury could reasonably have inferred that Ramirez agreed with others to provide northern transportation to undocumented aliens who had just crossed the border. His important role helped lure the aliens to the United States. In this way, Ramirez was part of a concerted effort to bring undocumented aliens to the United States. Accordingly, we affirm Ramirez's conviction on Count 1.

## D. Duplicity Challenge

Ramirez next claims that Counts 3 and 4 of the indictment were duplicitous. Each count alleged that Ramirez "did transport and move, and attempt to transport and move" an undocumented alien in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Before trial, Ramirez pointed out that each count charged both attempting to transport and actual transporting, which he claimed constituted duplicitous charging. Ramirez asked the court to order the government

to provide a bill of particulars or to elect between the two offenses. The district court denied both requests.

After the close of evidence, Ramirez requested an augmented unanimity instruction that would have required all twelve jurors to find either attempted transportation or completed transportation. The district court rejected Ramirez's request, stating: "[T]he only different element [between attempted transportation and completed transportation] is the act of transportation or moving.... I think that if the jury split and some people say attempt and some people say actually transport, then there is unanimity as to violation of the statute."

Ramirez claims that Counts 3 and 4 were duplicitous and that the district court failed to ameliorate the problem. We agree.

### 1. Standard of Review

■ We review de novo a district court's decision not to dismiss an allegedly duplicitous indictment. *See United States v. Bryan,* 868 F.2d 1032, 1037 (9th Cir. 1989).

### 2. Analysis

■ An indictment is duplicitous where a single count joins two or more distinct and separate offenses. *United States v. UCO Oil Co.,* 546 F.2d 833, 835 (9th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). "One vice of duplicity is that a jury may find a defendant guilty on a count without having reached a unanimous verdict on the commission of a particular offense." *Id.*

■ The government acknowledges that it may not charge a defendant in a single count with two separate and distinct offenses. It argues, however, that attempted transportation and completed

transportation are not separate and distinct offenses, and therefore that Counts 3 and 4 are not duplicitous. According to the government, both offenses are general intent crimes and both require at least a "substantial step" towards completion.

After Ramirez's trial, an en banc panel of this court decided *United States v. Gracidas–Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc). In that case, we were asked to interpret 8 U.S.C. § 1326 and to decide whether the offense of "attempt[ing] to enter" the United States was a general intent or specific intent crime. 231 F.3d at 1190. Concluding that "Congress intended to incorporate the well-established common law meaning of 'attempt' into § 1326," we held that attempting to enter the United States was a specific intent crime. *Id.*

■■■ Although Ramirez's case concerns § 1324, not § 1326, *Gracidas–Ulibarry*'s reasoning and conclusion applies with equal force here.[1] "When Congress has used a term that has a settled common law meaning, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of that term." *Gracidas–Ulibarry*, 231 F.3d at 1193 (quotation omitted). As in § 1326, Congress employed the word "attempt" in § 1324. *See* 8 U.S.C. § 1324(a)(1)(A)(ii). At common law, "the crime of attempt requires a showing of specific intent even if the crime attempted does not." *Gracidas–Ulibarry*, 231 F.3d at 1192 (quotation omitted). Therefore, we conclude that "attempt[ing] to transport" illegal aliens in violation of § 1324(a)(1)(A)(ii), requires a showing of specific intent.

■■■ Actual (completed) transporting under § 1324(a)(1)(A)(ii), however, is a general intent crime. *See* 8 U.S.C. § 1324(a)(1)(A)(ii) ("Any person who ... *knowing or in reckless disregard* of the fact that an alien has come to, entered, or remains in the United States in violation of law ....") (emphasis added).

■■■ This distinction is not without a difference. In Model Penal Code terms, specific intent corresponds to "purpose," while general intent corresponds to "knowledge." *Gracidas–Ulibarry*, 231 F.3d at 1196 (citing *Model Penal Code & Commentaries* § 2.02 (1985)). In the § 1324(a)(2) context, to convict a defendant of attempted transportation, the government must prove, among other things, that the defendant had the purpose, *i.e.*, the conscious desire, to transport an undocumented alien within the United States. *See id.* To convict a defendant of actual transportation, the government need show only that the defendant transported the alien within the United States with knowledge or in reckless disregard of the alien's undocumented status. *See* 8 U.S.C. § 1324(a)(2). Another "practical difference between these two levels of mental culpability is that certain defenses, such as voluntary intoxication and subjective mistake of fact, can negate culpability only for specific intent crimes." *Gracidas–Ulibarry*, 231 F.3d at 1196.

It follows then that attempting to transport, which requires specific intent, and actual transportation, which requires a showing of general intent, are separate and distinct crimes. Understandable as it was before *Gracidas–Ulibarry*, the government's inclusion of attempt to transport and transportation in Counts 3 and 4 re-

---

**1.** Because Ramirez's case comes to us on direct review, he is entitled to the benefit of *Gracidas–Ulibarry*. *See United States v. Nord-*

*by*, 225 F.3d 1053, 1059 (9th Cir.2000) (citing *Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)).

spectively, violates the principle of duplicity.

■ Nevertheless, "[t]he rules about ... duplicity are pleading rules, the violation of which is not fatal to an indictment. Defendant's remedy is to move to require the prosecution to elect ... the charge within the count upon which it will rely. Additionally, a duplicitous ... indictment is remediable by the court's instruction to the jury particularizing the distinct offense charged in each count in the indictment." *United States v. Robinson*, 651 F.2d 1188, 1194 (6th Cir.1981). In other words, a defendant indicted pursuant to a duplicitous indictment may be properly prosecuted and convicted if either (1) the government elects between the charges in the offending count, or (2) the court provides an instruction requiring all members of the jury to agree as to which of the distinct charges the defendant actually committed.

■ Neither of these remedies was employed in Ramirez's case. Before and during trial, Ramirez repeatedly objected to the duplicitous indictment and asked the court to order the government to elect between the attempt to transport and transportation charges included in Counts 3 and 4 respectively. The district court rejected Ramirez's requests. At the close of evidence, Ramirez sought a special unanimity instruction which would have required all twelve jurors to agree on either attempted transportation or actual transportation (or both). The district court refused Ramirez's request, concluding that "the only different element [between attempted transportation and completed transportation] is the act of transportation or moving." In light of *Gracidas–Ulibarry*—a case decided after Ramirez's trial—the district court's statement and subsequent decision not to provide an augmented unanimity instruction were erroneous.

Without either an election by the government or an augmented unanimity instruction, the duplicitous indictment went unremedied.

■ As a fallback position, the government claims that the duplicity error was harmless because "[t]he evidence was overwhelming that Ramirez[ ] attempted to transport, if not actually transported, the illegal aliens." Brief of Appellees at 21. Even if we agreed with the government that the evidence was overwhelming, the strength of evidence is beside the point in the duplicity context. "[R]eview of an indictment for duplicity is limited: In reviewing an indictment for duplicity, our task is not to review the evidence presented at trial to determine whether it would support charging several crimes rather than one, but rather solely to assess whether the indictment itself can be read to charge only one violation in each count." *United States v. Yarbrough*, 852 F.2d 1522, 1530 (9th Cir.1988) (quoting *United States v. Mastelotto*, 717 F.2d 1238, 1244 (9th Cir.1983)).

As discussed above, Counts 3 and 4 of Ramirez's indictment were duplicitous, and none of the potential remedies to that error was employed. Accordingly, we must reverse Ramirez's convictions on Counts 3 and 4.

**E. Sentencing Challenge**

At sentencing, the district court increased Ramirez's base offense level by two levels after concluding that Ramirez intentionally or recklessly created a substantial risk of death or serious bodily injury. *See* U.S.S.G. § 2L1.1(b)(5). Ramirez says the district court erred in applying the two level upward adjustment. We disagree.

### 1. Standard of Review

 We review de novo the district court's interpretation and application of the Sentencing Guidelines. *See United States v. Castillo,* 181 F.3d 1129, 1134–35 (9th Cir.1999). The district court's factual findings are upheld unless clearly erroneous. *See United States v. Reyes–Oseguera,* 106 F.3d 1481, 1483 (9th Cir.1997).

### 2. Analysis

Guideline section 2L1.1(5) provides that "[i]f the offense involved intentionally or recklessly creating a substantial risk of death or serious bodily injury to another person, increase by 2 levels ..." U.S.S.G. 2L1.1(5). Application Note 6 explains that section 2L1.1(b)(5) applies to a "wide variety of conduct [including] carrying substantially more passengers than the rated capacity of a motor vehicle ..., or harboring persons in a crowded, dangerous, or inhumane condition." *Id.* cmt. n.6

 The testimony of Gomez, Santiago, and the border agents established beyond any question that more than twenty people entered Ramirez's van. Based on this evidence, the district court made the following findings and conclusions during Ramirez's sentencing hearing:

> My finding in that regard is simply that [Ramirez], as the driver, saw a substantially large number of people in the back of the van, and there were no seats, and he was going to be driving on the highway. And that, at a minimum, creates a reckless risk of danger. That's sufficient. But also by driving the van, he would have intentionally created ... a high risk of danger for them or bodily injury or death, and a van not in the greatest condition because it broke down. By driving it he intentionally creates the risk.

The court's factual finding was not erroneous, let alone clearly erroneous. And, putting twenty people in a dilapidated van without seats or seat belts undoubtedly constitutes "carrying substantially more passengers than the rated capacity of a motor vehicle ..., or harboring persons in a crowded, dangerous, or inhumane condition." *Id.* The district court did not err by applying the two-level enhancement to Ramirez's base offense level.

### Conclusion

For the reasons expressed above, we AFFIRM Ramirez's conviction on Count 1, REVERSE his convictions on Counts 3 and 4, and REMAND for a new trial on Counts 3 and 4 respectively. We also AFFIRM Ramirez's forty-four month sentence on Count 1.

AFFIRMED in part, REVERSED in part, and REMANDED.